## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE      )
                   )
     **v.**                  )      **Crim. ID No.  2407006480**
                   )
MAYHEW WATSON.      )

Submitted: June 24, 2026
Decided: July 13, 2026

*Upon Defendant Mayhew Watson's Motion to Suppress*,
**DENIED**.

## MEMORANDUM OPINION AND ORDER

Stephen J. McCloskey, Esquire, Deputy Attorney General, DEPARTMENT OF JUSTICE, Wilmington, Delaware, for the State of Delaware.

John S. Malik, Esquire, Assistant Public Defender, OFFICE OF DEFENSE SERVICES, Wilmington, Delaware, for Mr. Mayhew Watson.

**WALLACE, J.**

# I. FACTUAL BACKGROUND[1]

At around 7:00 p.m., on June 11, 2024, Mayhew Watson was walking down North Market Street in Wilmington near the intersection of 38th Street.[2] He was wearing a black crossbody bag.[3] Wilmington Police Officers Linkhourst and Lerro were on patrol in uniform but driving an unmarked vehicle.[4] While Officer Linkhourst drove, Officer Lerro observed what he described as an "L-shaped" "protrusion" in Mr. Watson's bag.[5] Given what he saw and his prior experience, Officer Lerro believed the protrusion to be the outline of a firearm.[6] Officer Lerro

---

[1] "[T]he suppression hearing judge's first responsibility is to determine the historical facts from the testimony presented, physical or documentary evidence, and inferences from other facts." *State v. Jackson*, 2022 WL 18401412, at *2 (Del. Super. Ct. Dec. 28, 2022) (citing *Lopez v. State*, 861 A.2d 1245, 1248–49 (Del. 2004)). These are the facts as the Court finds them after the evidentiary hearing in this matter.

[2] Def.'s Mot. to Suppress ¶¶ 1–3 (D.I. 12); State's Answer ¶ 3 (D.I. 16).

[3] Def.'s Mot. to Suppress ¶¶ 1–3; State's Answer ¶ 3. At the hearing, Defense Counsel described that bag as "[b]asically[ ] like a little fanny pack that, instead of wearing it on your waist, it hangs from your shoulder." Hearing Tr. June 20, 2025 at 4.

[4] Def.'s Mot. to Suppress ¶¶ 1–2; State's Answer ¶ 1.

[5] Def.'s Mot. to Suppress ¶ 5; State's Answer ¶ 4; Hearing Tr. June 20, 2025 at 13, 15–17 (D.I. 35).

[6] Hearing Tr. June 20, 2025 at 13, 15–17:

> OFFICER LERRO: So when we were stopped at the stop sign at [the intersection], I observed Mr. Watson crossing the street . . . . I noticed a protrusion coming from within his fanny pack.
>
>              \*               \*            \*
>
> STATE's
> COUNSEL: So tell us a little more about what "protrusion" means.
>
> OFFICER LERRO: . . . So protrusion can be like an "L" that can happen with a weapon, more-so like a firearm. So like a t-shirt could cling to a firearm and you can see like the outline of a firearm; or a bag can kind of mold

explained that, after making that deduction, he noticed the bag swinging in an abnormal manner, "as if there was a heavy object within that bag."[7] Based on those observations, the officers decided to initiate contact with Mr. Watson.[8]

After exiting their vehicle, the officers approached Mr. Watson. Their initial interaction wasn't captured on body-worn camera footage, but the record evidence reflects that it was brief and resulted in Mr. Watson stopping and waiting for the officers.[9] Officer Lerro's body-worn camera footage begins in the middle of the conversation, with Mr. Watson making an unintelligible statement.[10] Whatever was said, Officer Lerro asks: "Do you mind if I pat you-, pat your bag just to make sure?" Mr. Watson responds: "Yeah, I don't got no firearm."[11] Immediately after that statement, Mr. Watson looks away from the officers and moves slightly.[12]

---

or shape itself around a heavy object, which would be like a firearm and could almost like mold itself around that firearm.

[7] Def.'s Mot. to Suppress ¶ 6; Hearing Tr. June 20, 2025 at 20:

OFFICER LERRO: So after I observed the initial protrusion that I believe to be a firearm within that bag, I continued to observe Mr. Watson . . , and I also noticed that the bag was swinging abnormally away from his body, as if there was a heavy object within that bag.

[8] Def.'s Mot. to Suppress ¶ 8; State's Answer ¶ 5; Hearing Tr. June 20, 2025 at 20 (OFFICER LERRO: "I went to exit my vehicle in order to make contact with Mr. Watson, and to see if he was in possession of a concealed firearm.").

[9] Def.'s Mot. to Suppress ¶¶ 9–10; State's Answer ¶ 5; Hearing Tr. June 20, 2025 at 32–37.

[10] Hearing Tr. June 20, 2025 State's Ex. 2 [hereinafter "Officer Lerro's BWC"]. The Court notes that the interaction at issue is shown at the beginning of the video and lasts less than ten seconds; accordingly, citing specific timestamps is unnecessary.

[11] Officer Lerro's BWC.

[12] *Id.*

Officer Lerro interpreted Mr. Watson's movements as an attempt to identify an escape route.[13]  The officers then detained Mr. Watson.[14]

Once Mr. Watson was secured, Officer Lerro removed the crossbody and inside found a Sarsilmaz B6 handgun that had 9mm ammunition in the chamber and 14 rounds in the magazine.[15]  Mr. Watson was then placed under arrest.  And a grand jury has since indicted him for Possession of a Firearm by a Person Prohibited; Possession of Ammunition by a Person Prohibited; and Carrying a Concealed Deadly Weapon ("CCDW").[16]

## II. PARTIES' CONTENTIONS

Mr. Watson brings this motion seeking to exclude admission of the firearm and ammunition from evidence in further proceedings.[17]  In Mr. Watson's eyes, the officers' initial interaction and subsequent discovery of the firearm violated his constitutional and statutory rights.[18]  He says that Officer Lerro had no specific

---

[13]  State's Answer ¶ 6; Hearing Tr. June 20, 2025 at 22:

> OFFICER LERRO:  He was looking both north and south, as if he was getting ready to flee. So at that point, due to the fact that I already believed there was a firearm in the bag, me and my partner at that point just detained him to avoid any officer safety issues and to safely pat that bag down.

[14]  Officer Lerro's BWC.

[15]  Def.'s Mot. to Suppress ¶ 11; State's Answer ¶ 8.

[16]  Def.'s Mot. to Suppress ¶ 12.

[17]  *See generally* Def.'s Mot. to Suppress.

[18]  *Id.* at 1.

suspicion that he was *unlawfully* carrying a concealed weapon.[19] Ultimately, Mr. Watson urges the Court to adopt the dissent from the Delaware Supreme Court's decision in *State v. Murray*.[20] He posits that, after the United States Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the *Murray* dissent is now the constitutionally required approach.[21] As such, Mr. Watson continues, now a proper view of reasonable articulable suspicion in circumstances such as this requires the seizing officer to also have some specific evidence that he lacked a concealed carry permit before he may be stopped.[22] And, as a result, without a specific reasonable articulable suspicion that Mr. Watson lacked such a permit, the stop would be unconstitutional because the officers lacked the requisite suspicion of criminal activity.[23]

---

[19] Def.'s Mot. to Suppress ¶¶ 31–33.

[20] Reply Br. ¶¶ 2, 8, 9 (D.I. 17); *see State v. Murray*, 213 A.3d 571, 580–85 (Del. 2019) (Traynor, J., dissenting).

[21] Reply Br. ¶¶ 2, 8, 9; Def.'s Mot. to Suppress ¶¶ 31–33 (citing *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022)).

[22] Reply Br. ¶ 8.

[23] Reply Br. ¶¶ 8, 9. Mr. Watson highlights the fact that no officer asked him if he had a concealed carry permit. *See* Def.'s Mot. to Suppress ¶ 32. As some support for this argument, he suggests a recent version of a Delaware criminal pattern jury instructions purportedly changed the law to make carrying without a license a substantive element that the State must prove. Reply Br. ¶ 3 (citing Del. P.J.I. Crim. (2022)).

No doubt, courts may, on occasion, reference jury instructions when explaining certain legal principles. But jury instructions are not law. *See* Del. P.J.I. Crim., at 1 (2022) (Preamble) ("The instructions themselves are not intended as legal authority and should not be cited as precedent."); *see also Corbitt v. Tatagari*, 804 A.2d 1057, 1062 (Del. 2002) (discussing a medical malpractice instruction, our Supreme Court stated that pattern instructions are only "guidelines" in presenting

The State opposes the motion, insisting that the officers had reasonable articulable suspicion that Mr. Watson was criminally carrying a concealed firearm, and further, because licensure is an affirmative defense—not an element of CCDW—the officers didn't, at the time of the stop, need specific evidence that Mr. Watson was carrying without a permit.[24] The State says the Court should adhere to *Murray*'s majority opinion.[25]

## III. STANDARD OF REVIEW

This Court's criminal rules permit a defendant to file a motion to suppress evidence prior to trial.[26] In a suppression proceeding, the Court sits as the finder of fact, assesses witness credibility, and weighs the evidence.[27] "As a general rule, the burden of proof is on the defendant who seeks to suppress evidence."[28]

But once the defendant has established a basis for their motion, *i.e.*, the complained-of seizure was conducted without a warrant, the burden shifts to the State to show that the warrantless action was reasonable[29] and that it did not violate

---

issues of fact to a jury and "are not dispositive."). One citing a jury instruction as if it were a statute or controlling legal authority is inverting the relationship thereof.

[24] *See generally* State's Answer.

[25] *See generally id.*

[26] Super. Ct. Crim. R. 12(b)(2), 41(f).

[27] Super. Ct. Crim. R. 41(f); *State v. Dewitt,* 2017 WL 2209888, at *1 (Del. Super. Ct. May 18, 2017); *Jackson*, 2022 WL 18401412, at *2.

[28] *United States v. Johnson,* 63 F.3d 242, 245 (3d Cir. 1995); *State v. Babb*, 2012 WL 2152080, at *2 (Del. Super. Ct. June 13, 2012).

[29] *Hunter v. State*, 783 A.2d 558, 560 (Del. 2001).

the movant's rights guaranteed by the United States Constitution, the Delaware Constitution, or applicable statutory law.[30] Should any evidence be found to have been recovered or derived from an illegal search or seizure, it may be excluded.[31]

## IV. DISCUSSION

### A. THE OFFICERS HAD REASONABLE ARTICULABLE SUSPICION TO STOP MR. WATSON.

Under the federal Constitution, police officers may briefly detain individuals for investigatory purposes when they possess reasonable suspicion that criminal activity is afoot.[32] These brief investigative detentions, commonly referred to as *Terry* stops, constitute seizures under the Fourth Amendment but are permissible even in the absence of probable cause so long as the officer can articulate specific facts giving rise to reasonable suspicion.[33]

Delaware law, too, permits such pedestrian stops.[34] Under our law, "law enforcement officers may stop or detain an individual for investigatory purposes, but

---

[30] *State v. Coursey*, 136 A.3d 316, 321 (Del. Super. Ct. June 3, 2016) (citing *Hunter v. State*, 783 A.2d 558, 560–61 (Del. 2001)).

[31] *Jones v. State*, 745 A.2d 856, 872–73 (Del. 1999).

[32] *Terry v. Ohio*, 392 U.S. 1, 26–27 (1968).

[33] *Flowers v. State*, 195 A.3d 18, 22–24 (Del. 2018); *Terry*, 392 U.S. at 26–27.

[34] Though, "not every encounter with the police is a seizure." *Williams v. State*, 962 A.2d 210, 214–16 (Del. 2008) ("During a consensual encounter, a person has no obligation to answer the officer's inquiry and is free to go about his business. Only when the totality of the circumstances demonstrates that the police officer's actions would cause a reasonable person to believe he was not free to ignore the police presence does a consensual encounter become a seizure.").

In this case, the State does not argue the police action when approaching Mr. Watson was anything less than a "seizure." Yet, given the contents of the video footage, whether the initial interaction

only if the officer has reasonable articulable suspicion to believe the individual to be detained is committing, has committed, or is about to commit a crime."[35]  Of course, an officer's mere hunch or unparticularized suspicion is insufficient.[36]

Whether an officer possessed reasonable articulable suspicion is determined by examining the "totality of the circumstances" known to the officer at the time the stop occurred.[37]  This inquiry is necessarily fact-specific and involves a two-pronged approach:

> First, the court must assess the 'objective observations and consideration of the modes or patterns of operation of certain kinds of lawbreakers.' Second, the court 'must consider the inferences and deductions that a trained officer could make which might well elude an untrained person.'[38]

Accordingly, "[a] determination of reasonable suspicion must be evaluated in the context of the totality of the circumstances as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining

---

would be deemed more than an "encounter" isn't a given. *See* Officer Lerro's BWC; Hearing Tr. June 20, 2025 State's Ex. 1 (Officer Linkhourst's BWC).  But with the State's implicit concession, the Court employs the usual *Terry* analysis.

[35]  *Woody v. State*, 765 A.2d 1257, 1262 (Del. 2001); DEL. CODE ANN. tit. 11, § 1902(a) (2024) ("A peace officer may stop any person abroad, or in a public place, who the officer has reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand the person's name, address, business abroad and destination.").

[36]  *Terry*, 392 U.S. at 27; *Lopez-Vazquez v. State*, 956 A.2d 1280, 1288 (Del. 2008).

[37]  *Lopez-Vazquez*, 956 A.2d at 1287; *Register v. State*, 337 A.3d 1224, 1234 (Del. 2024); *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

[38]  *Lopez-Vazquez*, 956 A.2d at 1287 (quoting *Quarles v. State*, 696 A.2d 1334, 1337 (Del. 1997); *Riley v. State*, 892 A.2d 370, 375 (Del. 2006)); *Register*, 337 A.3d at 1234 (same).

objective facts with such an officer's subjective interpretation of those facts."[39] "In determining whether there was reasonable suspicion to justify a detention, the Court defers to the experience and training of law enforcement officers."[40] "[T]he Fourth Amendment requires at least a minimal level of objective justification for making the stop[,]"[41] "but 'reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence[.]'"[42]

Here, under the totality of the circumstances, Officers Linkhourst and Lerro possessed reasonable articulable suspicion that Mr. Watson was carrying a concealed deadly weapon in violation of Delaware law, thereby justifying the investigatory detention from the get-go. Specifically, Officer Lerro observed an L-shaped protrusion and noted the weight and movement of the bag as Mr. Watson walked— no doubt, both objective observations.[43] Officer Lerro testified that, based upon his

---

[39] *Bryant v. State*, 2017 WL 568345, at *1 n.1 (Del. Feb. 8, 2017); *Flowers*, 195 A.3d at 27 (same).

[40] *Woody*, 765 A.2d at 1262; *Flowers*, 195 A.3d at 27 (same).

[41] *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *State v. Parks*, 95 A.3d 42, 47 (Del. Super. Ct. 2014).

[42] *Woody*, 765 A.2d at 1263 (quoting *Wardlow*, 528 U.S. at 123); *Parks*, 95 A.3d at 47–48.

[43] *See, e.g.*, *Flowers*, 195 A.3d at 22 (finding the standard was met when officers observed a rectangular object—later determined to be a firearm—printing through his shirt); *United States v. Carstarphen*, 298 Fed. Appx. 151, 153, 157 (3d Cir. 2008) (finding the standard was met when officers observed a "bulge" which turned out to be a firearm); *United States v. Haywood*, 657 Fed. Appx. 97, 99 (3d Cir. 2016) (finding the standard was met when officers observed a bulge in a subject's black vest and later, at a different angle but same subject, where an officer stated he could see what he thought "may be a handgun[.]").

training and experience, he believed the object to be the outline of a concealed firearm printing through Mr. Watson's crossbody bag. And based upon those observations and his experience identifying concealed firearms, Officer Lerro reasonably suspected that Mr. Watson was carrying a concealed firearm in violation of Delaware law. Given the totality of circumstances they then faced, the officers took reasonable steps to further detain Mr. Watson as they checked his bag—as he had agreed they could.[44] Officer Lerro was correct, and the officers found a loaded handgun in Mr. Watson's bag. They, then, placed Mr. Watson under arrest.[45]

## B. THE COURT NEED NOT CONSIDER MR. WATSON'S CARRYING CONCEALED LICENSURE STATUS (OR LACK THEREOF) WHEN DETERMINING WHETHER THE OFFICERS HAD REQUISITE SUSPICION—NON-LICENSURE IS NOT AN "ELEMENT" OF CCDW.

In many ways, Mr. Watson doesn't contest these findings or the process above. Instead, he argues that it isn't enough.[46] He says that "modalit[ies]"[47] have shifted in the context of Second Amendment rights in this country, and he argues that now officers "at a minimum must have a reasonable suspicion that [a defendant] was

---

[44] Officer Lerro's BWC; Hearing Tr. June 20, 2025 at 22. *See Parks*, 95 A.3d at 50 ("Still there has been and can be no bright line drawn between the permissible and impermissible degree of force or modes of restraint for an investigative detention. Instead, whether the means used to effect or the circumstances of an investigatory stop were reasonable must be decided on a case-by-case basis.").

[45] *See Murray*, 213 A.3d at 578.

[46] *See generally* Def.'s Mot. to Suppress; Reply Br.

[47] Reply Br. ¶ 6.

carrying a concealed deadly weapon *and* that he was without a license to do so."[48]

Mr. Watson believes that because Officer Lerro lacked specific information as to whether he possessed a license to carry a concealed deadly weapon, the officers couldn't have reasonably suspected he was violating 11 *Del. C.* § 1442.[49] But he misapprehends extant Delaware law.[50]

In Delaware, the State is not required to prove the absence of a license as an element of the offense of CCDW.[51] Rather, the burden rests with the defendant to establish that he was lawfully entitled to carry a *concealed* firearm at a given time and place by virtue of a license.[52] The Delaware Supreme Court reaffirmed this

---

[48] Reply Br. ¶ 9 (citing *Delaware v. Prouse*, 440 U.S. 648 (1979); *Bruen*, 597 U.S. 1).

[49] *See generally* Def.'s Mot. to Suppress; Reply Br.

[50] Mr. Watson's argument primarily relies on the United States Supreme Court's *Bruen* decision, a case that addressed the right to carry a firearm under the Second Amendment. 597 U.S. 1 (2022). He posits that courts in other states, like Massachusetts, have held that *Bruen* reshaped statutory regimes and the reasonable-articulable-suspicion standard similar to those at issue here. *See* Def.'s Mot. to Suppress (citing *Commonwealth v. Guardado*, 206 N.E.3d 512 (Mass. 2023)). He relies on this rather terse superficiality but fails to pinpoint any particular aspect of *Bruen* that has fundamentally changed Delaware's long-standing articulable-suspicion standard in this context. *See Murray*, 213 A.3d at 578–80; *see also id.* at 580–85 (Traynor, J., dissenting). And in doing so, he asks this Court to reverse well-settled search-and-seizure law in this State—including an all-fours Delaware Supreme Court decision—based on his read of a United States Supreme Court case that does not address like circumstances.

This Court must decline that invitation. Even were it so inclined—which it is not—this Court is not free "to ignore or disregard [controlling Delaware Supreme Court precedent] as outmoded or unfair, and decide this case based on its own view of what the law ought to be." *Shea v. Matassa*, 2006 WL 258312, at *5 (Del. Super. Ct. Jan. 10, 2006), *aff'd*, 918 A.2d 1090 (Del. 2007).

[51] *Upshur v. State*, 420 A.2d 165, 169 (Del. 1980); *Lively v. State*, 427 A.2d 882, 884 (Del. 1981).

[52] *Lively*, 427 A.2d at 884 (quoting *Modesto v. State*, 258 A.2d 287, 288 (Del. Super. Ct. 1969)) ("The burden is upon the defendant to establish that he had a license to carry a concealed deadly weapon."); *Murray*, 213 A.3d at 580 n.55; *Upshur*, 420 A.2d at 169.

principle in *Murray*, explaining that "[b]ecause the lack of a license is not an element of the offense, the presence or absence of a license need not, *and should not*, be considered in determining whether there was reasonable, articulable suspicion to stop the suspect."[53]

Mr. Watson's argument rests on the proposition that something material has changed since *Murray*. But he identifies nothing that shows that the law truly has. *Bruen* didn't alter the elements of 11 *Del. C.* § 1442 or the reasonable-suspicion standard, and no Delaware decision has held that licensure is now part of the reasonable-suspicion inquiry. Delaware law remains unchanged from *Murray*: an officer need not possess specific information regarding a suspect's licensure before initiating a *Terry* stop because the absence of a license is not an element of the then suspected CCDW offense.[54] The standard remains what it has been. And it is satisfied here. Examining it under both the Fourth Amendment and Delaware law, the stop of Mr. Watson was supported by reasonable articulable suspicion.

---

[53] *Murray*, 213 A.3d at 580 n.55 (emphasis added).

[54] Here, the officers weren't required to eliminate the possibility that Mr. Watson possessed a valid license before detaining him. *Murray*, 213 A.3d at 580 n.55. In fact, our law already holds that reasonable suspicion doesn't require certainty or the elimination of every innocent explanation. *Id.* at 579; *Register*, 337 A.3d at 1234–36; *Moore v. State*, 997 A.2d 656, 667 (Del. 2010) (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)) ("Moore argues that there could be other explanations for his presence in the area and the actions that [the trooper] observed. That may be, but as the United States Supreme Court has stated, however, '[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct.'"); *see generally State v. Maxwell*, 624 A.2d 926, 930–32 (Del. 1993) ("The possibility that there may be a hypothetically innocent explanation for each of several facts revealed during the course of an investigation does not preclude a determination that probable cause exists for an arrest.").

## V. CONCLUSION

For the foregoing reasons, the Court finds that the officers possessed reasonable articulable suspicion to conduct an investigatory stop of Mr. Watson. Because the stop was lawful, the evidence obtained as a result of that detention is not subject to suppression. Accordingly, Mr. Watson's Motion to Suppress is **DENIED**.

**IT IS SO ORDERED.**

/s/ *Paul R. Wallace*

_____

Paul R. Wallace, Judge

Original to Prothonotary